MERCEDES-BENZ USA If I'm pronouncing it correctly, it's Ivermeet vs. Mercedes-Benz. I think I pronounced that correctly. 2013-1007. In case you have any doubt, I'd like to put a warning in front of you that doesn't mean you're falling asleep. It means your time is running out. — Thank you. — Please proceed, Mr. Sullivan. May it please the Court. We're here seeking reversal of a summary judgment that two means clauses, one in each of the independent claims, are indefinite because, as held by the District Court, the patent specification disclosed no algorithm. And the patent specification includes, among other disclosures, it's pertinent, a set of software tables, and there's Table 10 that we focused on. Table 10 is titled, Sleep Propensity Algorithm Definition. And that, among other disclosures in the patent, provided, in our view, in our contention, sufficient algorithmic disclosure to support the entire function of each of the two claims. — Can I ask you this question? It seems to me that, besides Table 10, there's Figures 13 and 17, is it? — Three and 17. — Three and 17, I'm sorry. Three and 17. Is there any difference, according to your position, in whether that material together discloses, sufficiently discloses, a simple addition example and all the other possible permutations of the functional, the general functional definition that your expert testified to? If I were to think about whether Figures 3 and 17 disclosed a simple two-function addition function, time of day a certain number, wobbly wheel extent another, add them together, have a threshold, either above it or below, is it your position that that implicit disclosure is as great for that example, I'm sorry, is no better for that example than the range of other possible combinations of eight or ten factors? Because if it were just the one, you would then have a quite narrow range of equivalents, and I'm trying to figure out where you stand if I were to think that implicit disclosure were sufficient but nothing else is. Right. Well, Your Honor, I, along with the expert, haven't thought through completely the issue of equivalents, which wasn't before us. Some of the deposition testimony of the expert got into that. In my view, and what we've contended, based on the expert's statement, is that the teaching is not limited to just addition, and in his view, it could be as easily implemented. Right. Let me see if I can just pinpoint the question a little bit better. Is the teaching every bit as good for all the other variations as it is for the addition hypothetical that I just described? Our expert's opinion was that yes, that it is. So, the district court, in holding the two claims invalid, put these claims into the category of what's referred to as the NOAA case. NOAA, the Intuit, talks about two categories. There's a set of no algorithm cases, where there's no algorithm disclosed at all, and then other cases, like type I, and touch is one that we discussed, WMS Gaming, and there are some others, where there is an algorithm disclosed, but the parties were fighting about the scope of it and whether it was sufficiently disclosed. The court, in ruling, put this in the category of no algorithm. In spite of Table 10 and the other disclosures, the court held, at least for two of the three subparts in each of the claims, that there was no algorithm at all, and ended the analysis there. Did the district court really say that? I understood her to say, and I'm just getting confused now, I thought she cited NOAA systems, and she cites it partly, at least for the proposition, that when the disclosed algorithm supports some, but not all of the functions, we treat the specification as if no algorithm had been disclosed at all. So, it wasn't just like no nothing, it's like even if there's some sort of algorithm disclosed, but it doesn't support the functions, we're treating it as if there's no algorithm. Isn't that really what she's saying? My understanding of what, and she makes this probably most clear at 821, and there's also a footnote on that page, because we had three subparts of a function in each of the... Right, and she's calling them three functions and an equivalent. Right, and I don't see that being a meaningful issue here. Further, in each of them, we have the waiting by the time of day and circadian rhythm, that's in each of the claims. She holds that there is an algorithm for that, and it's the other two parts, the deriving and overall sleepiness calculation in Claim 1, the computing steering transitions in Claim 9, and then the providing and outputting function in both those claims. She holds that those have no algorithm, is my understanding from the order. And then in the footnote on 821, the district court says, well, I've looked at the experts, but I don't really have to. And she did not proceed to the analysis. What's your understanding about what the district judge thought the algorithm was for the circadian rhythm components, the S-circ? Looking at the S-circ is described also in Figure 3 and Figure 13... 17. 17, sorry, and in Table 10, that having a value that varies based on what time of day it is, corresponding to how likely you are to be sleepy, just based on circadian rhythm, that the variance of that during the course of the day affects the waiting, which is what the function is in the claim. So I've weighted the calculation of sleepiness if it's two in the morning, tired, because S-circ is tired. Even though there isn't, as I think your expert was taking pains to say, there isn't anything in Table 10 or in particular at the top of Table 10 that indicates what you do with this S-circ. And in particular, he was taking pains to say, this is not the addition of numbers. Right. However, when you restrict yourself to simply specification teachings, the expert does talk about Figure 3 and Figure 17 and how that adds to the teaching of what's in the patent. He also made the point that one of a hundred skill could do other things. There's two issues, right? One, in terms of claim construction, what's in the disclosure itself. And then the other issue of what that teaches to the art. And then ultimately, perhaps, what are the range of equivalence? That would be the infringement question we haven't even addressed yet. So as our brief details for each of Claim 1 and Claim 9, in pages 20 through 23 for Claim 1, pages 28 through 30 for Claim 9, we spelled out our contention as to the steps of an algorithm for each claim that does account for each part of the function and where that is in the disclosure and how the expert discussed it. In our view, reversal is necessary because the actual teachings, as explained by the expert, preclude a summary judgment finding that there's clear and convincing evidence that one of ordinary skill could not implement it or could not understand it. And that's the standard discussed in various cases, Noah and others, that if you have an algorithm and the debate is, well, is it good enough, that the test is, would one of ordinary skill understand it and be able to program it? In this case, you would write program. And the patent specification doesn't have the entire program in it. And it's not just that it doesn't have the program in it. It doesn't actually have any relations between the various components that could go into the ultimate calculation. Not even for the Claim 9, what I described as assigning a number to the wobbliness of the wheel, adding it to a time of day number. Very simple, but it doesn't actually even say that. Well, it does say, Your Honor, that in the, take the S0X, the zero crossings factor that relate to steering. What the patent does say is that you're measuring for a decrease in those. No, I think that the patent gives a fair bit of detail about each of the possible components. It says how many times you go away from vertical. It says how far you go away from vertical. And it gives pretty understandable measurements of those. What it doesn't do is say, Now what? What do I do with these things? Right. And what our expert says in his report, in his declaration, and again, we put those citations in the brief, what the expert says. You can do any number of things. But that's not the same thing as saying here in the specification is even one example of doing something with those things. Well, he does say you can do any number of things, but he also says that one of ordinary skill would know how to do it. That's not, I think, the test for what the specification actually discloses as an example. Well, it says you can do any number of things. Skilled artisans would know how to do any number of things really up to that. Well, but he's also saying that one of ordinary skill would be able to read what is in the patent, express factors that are provided in there. The complete list of the inputs is recited in the specification. And what the expert said is one would know how to program that. Yes, he says there are choices and other things you could do, but in part he's talking about two different things there. Yes, you could implement a monitor that does a variety of different things, and that might even get into the equivalence issue again. But he also says that taking the expressly provided factors that is a complete set in the specification, that you could program those and get a monitor. Yes, a programmer would make some choices in terms of value scales and warning threshold levels and things like that, but all within the parameters of what's expressly disclosed. That's not the only thing the expert says, but he does say that. I see I'm into my rebuttal time. We will save it for you, Mr. Sullivan. Mr. Doyle. Good morning, Your Honors. May it please the Court. I'm here today, my name is Scott Doyle, and with me is my co-counsel, Jonathan DePossi, who is representing Daimler and Mercedes-Benz today. What I'd like to do is start right off with the issue you're defining, in particular with respect to Table 10. I think it's very important to look at what Ibram-Yath is saying, because what they are saying with respect to Table 10, and effectively the rest of the disclosure they cite too, in Column 2 and Column 3, is essentially a violation of all the case law that this Court has ever rendered on these issues. Let me just give you the sum total of the algorithmic structure for deriving driver drowsiness from Ibram-Yath. It is, quote, incorporating additional factors beyond circadian rhythm weighting to determine likelihood of sleepiness. That's it. That's a step. That's not a step-by-step algorithm. It's pure function. It actually says less than the claim language itself, and it fails to identify any specific algorithm. Can I ask you this? It seemed to me, when I was reading this, that the most important thing missing from the specification was the one thing that the District Court thought was sufficiently there. Can you address that? The weighting. The weighting, Your Honor? Sure. I think the weighting, and it goes to the other problem that Table 10 essentially has. The District Court pointed to it, and there wasn't a lot of language in the District Court opinion with respect to the weighting. They pointed to, I guess, the S-cert factor, which is in Table 10. But the S-cert factor, other than saying S-cert, is pretty much undefined. And also, Ivor Maez has pointed to Figure 3 and Figure 17 with respect to adding support for the weighting function. But the problem is, Figure 3 and Figure 17 provide examples of circadian rhythm throughout the day. Now, I'm sure some might say that those examples would be different. But what it doesn't show is how to actually use those particular factors to weight. Well, Figure 17 pretty strongly suggests the way that I was describing. You have a number for the time of day, and if the morning level is above it, you're going to add something to it. But what you add, Your Honor, I think what Figure 17 shows is a factor called S-mod, which is actually at the top of Table 10, which is what I believe they're calling akin to the driver drowsiness factor, which includes a whole bunch of factors. I think there are eight factors, including S-cert. And so, what is actually being shown in Figure 17, and even Ivor Maez, expert, agrees that it doesn't disclose an algorithm. He even said it's an example of what you could use as part of a weighting algorithm. But what it shows is the circadian rhythm, and then shows that you could have this S-mod factor, which then you could add to the S-cert in order to get a certain level. The problem is, S-cert is undefined. We don't know how to use that particular term to weight. Is summary judgment appropriate in this case? Absolutely, Your Honor. Absolutely. Don't you need testimony of what one's skills in the art would be able to do? I don't believe in this case you do, Your Honor, because just looking at the particular functions, what Judge Hochberg said down below, is that there was a lack of any structure with respect to two of the functions of Claim 1, and also with respect to two of the functions with respect to Claim 9. She believed that there was an algorithmic structure with respect to the weighting, but not the others. And so, therefore, she ruled under essentially the NOAA system that she need not consider expert testimony. Now, it's interesting that she did actually consider the expert testimony. She said that very clearly that she looked at what Dr. Yoakum had to say with respect to the various algorithms that were being proposed, and find that he essentially didn't say anything about the values in Table 10, for example, other than saying they're easily understood. What's really interesting is Dr. Yoakum's testimony, in almost all instances, actually supports the finding of Judge Hochberg that there is no structure. For example, he comes up with, for Table 10, he comes up with a template theory that I believe you're referring to, which was simply stated that you use circadian rhythm, and then one or more of those other factors, in any way you want to combine them, and one of the already skilled in the art would know how to make a method or algorithm. That is the point of this case, Your Honors. A listing of factors, as Ibram Mayes himself said in the brief, is not a step-by-step algorithm. Moreover, it's meaningless. Even presuming that one of ordinary skill in the art could come up with an algorithm based on just the factors, as this Court has held over and over again in Blackboard and many other cases, the purpose of 112.2 is to demarcate the balance of the scope, of the coverage. It's not the question... I think they're confusing it with enablement, whether someone can make and use the invention, but here it's whether, is there an algorithm disclosed? Not only that, but an algorithm still has to be disclosed. And Ibram Mayes, the expert himself, admitted that Table 10 is merely a template for generating all sorts of different algorithms. Ibram Mayes itself, when they say that it's merely incorporating additional factors beyond circadian rhythm weighting to determine likelihood of sleepiness, that functional language is saying the same thing. You can use one, you have to use circadian rhythm factors, but then you can use any other type of factor in determining how to derive sleepiness, how to weight, and also how to output. Your Honor, there's no way that an accused infringer or anybody else, a competitor, could determine the balance of the scope of this claim, because it literally covers hundreds or thousands of different possible algorithms. And this Court has been very clear in all cases that there needs to be a step-by-step procedure or algorithm set forth in the specification. And in this case, there's not at all. Even their expert states, because a person of ordinary skill in the art would have to select the factors amongst the factors at the top of Table 10. He would determine how to calculate the factors, how to weight those factors, how to combine those factors, or how to correlate the factors. Your Honor, you simply can't state the ingredients. I mean, even if you're baking a cake, in terms of sugar, salt, flour, you can't just state the ingredients, but you have to state how much flour do you add, when do you add it, what do you add it to, how long do you bake it, at what temperature. That, Your Honor, is a recipe or an algorithm, which is required by computer software, a step-by-step process. And merely listing factors is not going to get it done. Not only that, I mean, when you first look at Table 10, it does appear to have more than the column 2 and column 3, which is pure functional language that I think we can quickly disregard. However, when you actually look at it, there's no disclosure whatsoever as to how to calculate each of those individual factors. There's no disclosure of the contributory importance of those factors to driver drowsiness. There's no disclosure as to when somebody's going to be sleepy or when they're going to be drowsy, according to this particular algorithm. There's no disclosure of time periods, no disclosure of when you issue a warning. Again, no disclosure of which elements are more important than others. Then finally, I would argue that when you look at these particular elements, it says at light, plus temperature, plus steering movements, plus trip duration. Well, these all have different units. How can they even be added together based on the disclosure at the top of Table 10? There's not even a sufficient disclosure at the top of Table 10 for even adding these particular elements together. Can I ask you a question? Sure. Claim 1 and Claim 9, the warning, I'm sorry, the output for the warning in Claim 1, those are two different things. Claim 9, what's the warning indicator? Is that more like the output or the warning from Claim 1? Well, Your Honor, Ivermite is claiming that providing a warning indication is merely a display screen or hardware. But this Court has many, we still believe it's a computational means that's providing a warning indication, and therefore it requires software. And so... In Claim 1, the output is plainly part of the computational means element, and then you use the output in order to trigger the warning indicator. And all of this, all the analysis, I think, of this report was about the computational means. I don't understand that there's a 112F issue about whether it's a light or a noise or a shaking of the seat or the mechanism by which the warning is communicated to the driver, just about the final number that triggers whatever that mechanism is. Well, Your Honor, I think because it's part of the computational means function, and there are three functions associated with the computational means. One is the waiting, one is the driving driver sleepiness, and the third of which is providing an output. We believe that providing an output falls under, I don't believe they disagree with us with this, in terms of that it must be software. And so there must be a disclosure how to perform that function. Right, to provide the output, which is a number that then leads to something else later in Claim 1. What I'm trying to understand is how that, it seems to me, plain distinction within Claim 1 applies or doesn't apply within Claim 9, which is a much narrower claim. I think the distinction is still the same in the sense that there's going to be some driver drowsiness determination in Claim 1, for example. There's also going to be a determination in Claim 9 based on computing the steering transitions and waiting according to time of day. And then at that point, there must be a decision as to whether or not to provide an alarm or to provide a warning indicator. So I think that the two are actually synonymous in that instance. So the question then becomes, okay, is there sufficient disclosure in the specification to provide such an output? We say that there's not. I think, frankly, I think their expert agrees with us because the expert, you know, if you go to Figure 17, which discloses the three warning levels, that it doesn't disclose when they are triggered or what kinds of output you actually get. So you still need a step-by-step algorithm since it falls under means plus function terminology. So there's a function of providing an output. So now we need to go and determine the structure for doing so. And the structure here would be a combination of hardware and software. But there are essentially, again, no step-by-step algorithm for doing that. With respect to Figure 17, again, I point to the itemized expert. He said very clearly, he said, and I quote, at age 6, 8, 3, you know, in my mind, there's no complete algorithm disclosed here. This teaches how it's an example of what you could use in an algorithm. Therefore, because there's no disclosure of how or when the computational means actually issues a warning, this claim does not provide sufficient structure or any structure within the specification for doing that, Your Honor. I see I have two more minutes, Your Honor. I'll be very brief. I didn't mention columns 2 or column 3. I'm not sure how much I need to go into detail with respect to that. Both of those simply repeat functional language from the claims. Claim column 2, for example, talks about real-time behavioral sensing,  provide an audiovisual indication of some of the behavior. Clearly, that doesn't disclose how to wait, how to determine driver drowsiness. And we've already discussed the factors at the top of Table 10. Finally, with respect to, you pointed out, Your Honor, I guess in Claim 9, there's a means for computing steering transitions for all the same reasons that we've discussed with respect to Table 10 for Claim 1. Essentially, at Xerox and SRMS, there's no disclosure how to actually determine those particular values. They come awfully close. They're basically two ways. Pick a time period, and how much during that time period is the wheel going away from some sector around vertical? That's one, and the other one is how far are they going through a very standard measure of the distance and average it over some period of time? Yeah, what they actually appear to, if they do state that, and that's in the specification in the actual tables themselves, they talk about comparing to some reference value that's never even provided with respect to either of those two. So again, I guess what I should state is there's no correlation to when somebody is alert or somebody is drowsy with respect to those two factors. I think you had mentioned that earlier in your earlier question. And there also doesn't appear to be a way to calculate that in terms of Table 10. And that's what I was referring to, Your Honor. And so because of that, again, there's no disclosure as to how you actually determine that. You know, I come back to this at the very end just to point out that looking at what I remind the saying about the proposed structure of weighting, which is merely using circadian rhythm to calculate driver sleepiness, deriving, incorporating additional factors beyond circadian rhythm weighting to determine likelihood of driver sleepiness, and finally, outputting, comparing the likelihood of sleepiness to a warning threshold and producing a corresponding output. These are not a step-by-step algorithm for performing these three functions at all. They don't even come close. It's boundless. On multiple occasions, the expert says that person of ordinary skill in the art have to figure out what methods to apply because that is not the standard by this Court, they feel. Thank you, Your Honor. Thank you, Mr. Doyle. Mr. Sola has a few minutes left. Mercedes has made a lot of arguments to do things. First, they change what our argument is, and secondly, they make arguments unsupported by any clear and convincing evidence from their own experts, even. And below, they repeatedly posited different algorithms, different proposed constructions for both Claims 1 and Claim 9. Granted, they're also arguing that those disclosures aren't sufficient, the algorithms aren't sufficiently described, but that's the test that calls for looking to the evidence from one of ordinary skill that we presented. And our expert, again, it's been misdescribed what he said. He did not say there's no algorithm. He said there is an algorithm. He pointed to where it's disclosed. He also said that one of skill would be able to implement based on the teachings. Now, we've discussed today how if you look at one factor and there's not a scale there or that specific values aren't there, he testified how one of ordinary skill could still implement it. And the definition from the case law of what's an algorithm, what's the construction when you have this kind of mean structure, it doesn't require that kind of detail if one of ordinary skill could understand it and implement it. And in the battle of the experts, they lose. They presented two. One is a PhD psychologist who had a lot of experience managing research projects, but it doesn't have the computer expertise to opine on what could or couldn't be programmed. Their other expert is a computer scientist, but has no experience in this area. Whereas our expert, we've retained an expert who is not a professional testifying expert. He is a practitioner in this area. He's developed, built similar systems. And in his testimony, we believe, along with the actual teachings of the specification, which we all agree are the first place to look, preclude the summary judgment that these claims are indefinite. So we ask that this court reverse it. Thank you, Mr. Solon. We'll take the case under review.